# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

DAVID STEPHEN SULLIVAN,    )
                       )   Civil Action No. 16-1775
         Petitioner,   )
                       )
v.                       )
                       )   Magistrate Judge Robert C. Mitchell
JAMEY LUTHER, Superintendent and   )
the ATTORNEY GENERAL FOR THE   )
STATE OF PENNSYLVANIA,      )
                       )
         Respondents.   )

## <u>MEMORANDUM OPINION</u>

Presently before the Court is a Petition for Writ of *Habeas Corpus* (ECF No. 1) filed by David Stephen Sullivan ("Petitioner") pursuant to 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("ADEPA"). For the following reasons, the Petition will be denied.

### A. <u>Relevant Factual and Procedural History</u>

Petitioner, by his counsel, challenges the judgment of sentence imposed by the Allegheny County Court of Common Pleas, at CP-02-CR-02944-2005, following his conviction for the offenses of involuntary deviate sexual intercourse, indecent assault on a person less than 13 years of age, endangering the welfare of children, corruption of minors, and terroristic threats. (ECF No. 14, ¶ 4). The charges in this matter stem from Petitioner's sexual abuse of his minor step-daughter, M.B. The Superior Court of Pennsylvania summarized the relevant facts as follows.

> [Petitioner] met his ex-wife in the spring of 1995. ([N.T.], 10/24-26/[2006] at 446). She had a young daughter, M.B., who is the victim of the crimes discussed herein. M.B. is autistic and suffers from attention deficit hyperactivity disorder and depression. (<u>Id.</u> at 45). M.B.'s biological father played no role in her life. (<u>Id.</u> at

1

49). Upon marriage, [Petitioner] assumed the role of M.B.'s father. (Id. at 447). M.B. grew up believing the [Petitioner] was her biological father. However, after the couple divorced in 2003, a custody dispute arose toward the end of December 2004, and M.B. was told [Petitioner] was actually her step-father. (Id. at 62, 68, 71).

Following the divorce, [Petitioner] and his ex-wife agreed, without a custody proceeding, that [M.B. and her half-brother, D.S., who was the biological son of Petitioner and his ex-wife,] would remain with [Petitioner] for the time being. (Id. at 385-386). The children moved with [Petitioner] to the home of [Petitioner's] mother. (Id. at 63). Here, [Petitioner] resided in the basement which was described as a finished game room. The room had an open area with a pool table, a bathroom, a living room area, a computer room, and an area set up like a bedroom. (Id. at 209-210). M.B. lived in this house for over a year. (Id. at 37). M.B. visited her maternal grandmother ("Grandmother") approximately once every two months. (Id. at 51). During one of these visits, Grandmother asked M.B. if anyone was touching her inappropriately as she believed M.B. seemed very withdrawn. (Id. at 46). M.B. told her Grandmother nothing wrong had happened. (Id. at 47).

However, after M.B. learned that [Petitioner] was not her biological father and custody proceedings commenced, Grandmother again asked M.B. if anyone was touching her inappropriately, and M.B. admitted that [Petitioner] had. (Id. at 40). M.B. testified that when the family was living together in a trailer, she walked in on [Petitioner] watching an adult movie. The assaults began when they moved in with [Petitioner's] mother. (Id. at 134).

M.B. stated that [Petitioner] "touched me in places I don't[] want to be touched," specifically, her "boobs, vagina, and butt." (Id. at 88). She also testified that she had touched [Petitioner's] "nipples, penis, and butt' and that they both engaged in oral sex. (Id. at 89). [Petitioner] explained to M.B. that "all daddies and daughters did it" and that if she told anyone he would beat her or leave her. (Id. at 97-98, 111, 274). [Petitioner] would show M.B. magazines that depicted couples engaging in sexual intercourse. (Id. at 96-97). M.B.'s testimony suggested that [Petitioner] would use the magazines and pornographic movies to persuade her that sex with a parent was a proper and normal activity. (Id. at 97-98).

The Commonwealth presented evidence that [Petitioner] owned two magazines entitled "Tight." (Id. at 221). In "Tight," the models were over 18 but dressed as much younger girls. The girls depicted in "Tight" described relationships with older men such as stepfathers, uncles, and neighbors. (Id.). The older men would give young women presents in exchange for engaging in sex acts. (Id. at 224). One of the stories in "Tight" was structured around a "club house," where an older male would engage in sexual activity with a young girl. (Id. at 223). M.B. testified that [Petitioner] would create a "club house" by draping a blanket over a pool table which was located in the basement of his mother's home. (Id. at 98-100).

He would take M.B. underneath the pool table to engage in sexual activities and promised her a computer and a game membership if she acquiesced. (Id. at 101, 114).

The Commonwealth also presented evidence of other storylines in "Tight" involving a teenage girl having sex with an older man whom she refers to as "daddy." (Id. at 223-224). One such story was entitled "I'll tell mom" and involved a "gentleman [who] married a woman that already had a daughter from a previous relationship." (Id. at 227-228). The storyline referred to the sexual relations between the step-daughter and the man as being a "secret." (Id.).

M.B. also testified that [Petitioner] would take photographs of her in different sexual positions with a Polaroid camera that belonged to [Petitioner's] mother. (Id. at 108-110). [Petitioner] explained to M.B. that he later burned the pictures. (Id. at 110). [Petitioner] also asked M.B. to touch and lick a fake penis, which she described as peach in color. (Id. at 107). [Petitioner] also asked M.B. to play a sexual dice game which was stored in a purple bag in the basement. (Id. at 104-106, 168). M.B. also testified that [Petitioner] used strawberry flavored gel for oral sex, as he told her it would "taste better." (Id. at 91-94, 104, 107-108, 168).

Based on these allegations, Detective Gregory Matthews ("Detective Matthews") obtained an arrest warrant and a search warrant and on January 12, 2005, proceeded to arrest [Petitioner] and search his residence. (Id. at 207-208). Detective Matthews recovered several pornographic magazines and movies; the magazines were recovered from the desk in the computer room where M.B. had believed they were located. (Id. at 210). Detective Matthews also recovered the purple bag that M.B. alleged to have contained the dice game. (Id. at 211-212, 230-231, 252). The dice game, fake penis, the strawberry flavored gel, and a Polaroid camera were not found during the search. (Id. at 252).

Commonwealth v. Sullivan, 987 A.2d 825 (Pa. Super. filed October 27, 2009) (unpublished memorandum, at *1-5).

On October 30, 2006, following a jury trial before the Honorable Donna Jo McDaniel, Petitioner was found guilty of the aforementioned offenses. On January 18, 2007, he was sentenced to a term of 18 to 36 years' incarceration. Petitioner was represented at trial and sentencing by Robert Stewart, Esquire. Petitioner, through the Allegheny County Public Defender, filed timely post-sentence motions and a direct appeal raising three issues:

1. Was [Petitioner] prejudiced by the admission of evidence where the Commonwealth used legal adult entertainment magazines in an attempt to demonstrate that because [Petitioner] had such magazines he also was guilty of numerous sex crimes against a minor?

2. Did the lower court err in not granting [Petitioner] a new trial based on his challenge to the weight of the evidence where the Commonwealth's evidence was of such low quality, tenuous vague and uncertain that the verdict of guilt shocks the conscience of the court?

3. Did the lower court err in imposing a manifestly unreasonable sentence and in considering improper factors when fashioning this sentence?

Respondent's Reproduced Record, at 54.

The Pennsylvania Superior Court affirmed Petitioner's judgment of sentence on October 27, 2009. Thereafter, the Pennsylvania Supreme Court denied his petition for allowance of appeal. See Commonwealth v. Sullivan, 987 A.2d 825 (Pa. Super. filed October 27, 2009) (unpublished memorandum), *appeal denied*, 8 A.3d 345 (Pa. 2010).

On December 21, 2011, Petitioner, through new counsel Thomas N. Farrell, Esquire, filed a petition for relief under Pennsylvania's Post Conviction Relief Act ("PCRA"), 42 Pa.C.S. § 9541 *et seq.* On June 4, 2012, Attorney Farrell filed an amended petition asserting two claims of error: that "[t]rial counsel failed to investigate and/or present a witness that was exculpatory in nature and would have supported a not guilty verdict" and that Petitioner's sentence was illegal. Respondent's Reproduced Record, at 256. The alleged exculpatory witness was identified as D.S., who was ten years old at the time of trial.

On August 23, 2012, Judge McDaniel, acting as PCRA court, issued a notice of intent to dismiss the PCRA petition without a hearing. Petitioner filed a response which sought permission to file a second amended PCRA petition. The PCRA court granted this request and, on January 9, 2013, Attorney Farrell filed on Petitioner's behalf another amended petition. On March 12, 2014,

the PCRA court issued an order denying the second amended petition without a hearing. Petitioner

took a timely direct appeal from this order, raising five issues for the Superior Court's review.

1. Did the lower court err and abuse its discretion when it denied [Petitioner's] amended motion for post-conviction relief without a hearing, through a fill-in-the-blanks form order, where his petition included specific claims that he was denied effective assistance of counsel when trial counsel failed to present an exculpatory witness supported by certifications and appropriate legal authority, solely because trial counsel believed the [trial] court would be upset with him given the witness'[s] age[?]

2. Did the lower court err and abuse its discretion where it held [Petitioner's] petition was defective because the attached certifications, filed pursuant to <u>Commonwealth v. Brown</u>, 767 A.2d 576 (Pa. Super. 2001), were not affidavits despite there being nothing in statute or rule requiring affidavits to support [Petitioner's] petition[?]

3. Did the lower court err and abuse its discretion where it incorrectly concluded that the testimony from an exculpatory witness, who was never called by trial counsel out of fear that to do so would upset the court, was not more than cumulative when the record plainly demonstrates that the proffered testimony would directly say the victim lied about the allegations of abuse because she was mad at her father[?]

4. Did the lower court err and abuse its discretion when it dismissed, without a hearing, [Petitioner's] newly-discovered evidence claim as abandoned on appeal where its order dismissing the petition was silent as to its reasons, was nothing more than a fill-in-the-blanks form order and as a result, [Petitioner] reserved the right to address further issues pursuant to <u>Ryan v. Johnson</u>, [] 564 A.2d 1237 (Pa. 1989), and where [Petitioner's] petition plainly argued newly-discovered evidence as an alternative theory of relief[?]

5. Did the lower court err and abuse its discretion in dismissing without a hearing, through a fill-in-the-blanks form order, [Petitioner's] claim that his sentence was illegal as "patently frivolous and without support on the record"[?]

<u>Commonwealth v. Sullivan</u>, 120 A.3d 370 (Pa. Super. filed February 5, 2015) (unpublished

memorandum at *1-2).

On February 5, 2015, the Pennsylvania Superior Court affirmed in part, vacated in part,

and remanded the case for the PCRA court to hold an evidentiary hearing and "make findings of

fact with respect to the reasonable basis of counsel's decision not to call D.S. as a witness." <u>Id</u>. at

*3.  The Court further instructed that, if it determined that "counsel's decision lacked a reasonable basis, the PCRA court shall then determine whether counsel's omission prejudiced" Petitioner. Id. Petitioner did not seek review by the Pennsylvania Supreme Court of the claims that were affirmed by the Superior Court.

The evidentiary hearing was held before the PCRA court on September 3, 2015. Petitioner, represented by Mark K. McCulloch, Esquire, called D.S. and Attorney Stewart to testify pursuant to the Superior Court's limited remand order.  D.S., a college sophomore at the time of the hearing, testified that

> he was aware of the circumstances that led to [Petitioner's] being incarcerated, including "accusations that [M.B.] had made regarding inappropriate sexual contact." N.T., 9/3/2015, at 5. D.S. knew that the incidents were alleged to have occurred in the basement of the house, and confirmed that he and his sister were often down there. Id. at 16. D.S. indicated that, during that time, [Petitioner] was responsible for him and his grandmother was at work. Id. at 18. D.S. testified to a brief description of the basement and the "pool table that had been mentioned as where the incidents had taken place," stating it was "very small" with storage containers filled with toys underneath and "wood that came down was like with [sic] structures to keep it up," such that the containers were hard to remove at times. Id. at 8, 16–17.

> D.S. also explained that when [Petitioner] was first arrested, a representative from Children, Youth, and Families asked D.S. if he "ever saw anything going on" and D.S. told the representative he "did not." Id. at 7. The representative asked D.S. "how long—how often [D.S.] was around the house with [Petitioner] and [M.B.]," and D.S. told him he was "there all the time." Id. at 7–8. On cross-examination, D.S. confirmed that he was present during all the time of when the incidents were alleged to have occurred and that he "did not witness any act." Id. at 29–30, 32.

> D.S. also recalled having a conversation with M.B. on two occasions, "[o]ne in March of 2005 and one in May of 2005." Id. at 9. As for the March 2005 conversation, D.S. stated as follows:

> > [D.S.]: [M.B.] told me she wished things could go back to the way they were. And I told her—I asked her, "Why did you lie?" She said she wished she didn't. I told her she needs to tell somebody and tell

the truth. And she responded by saying, "I need to go talk to nana," and she it [*sic*] ran off."

[Attorney McCulloch]: Okay. ... You said that your sister told you that she wanted things to go back to the way they were. What did you understand that to mean, sir?

[D.S.] Back to living with my dad and my grandmother after my parents divorced.

\* \* \*

[Attorney McCulloch]: Let me go back to conversations that you had with your sister. You said or she told you that she wished things had gone back to the way they were and you said why did you lie. Tell me why that was your response, sir.

[D.S.] Because I knew she lied. She lied all the time and I knew she lied about this because I was there. Where she said the allegations took place. All the time.

[Attorney McCulloch]: There was never a time when you weren't with your sister?

[D.S.]: Not at home.

Id. at 9–10, 12–13. D.S. further testified that the conversations in March 2005 and May 2005 were consistent. Id. at 20. D.S. stated that, with respect to the conversation in May, he told M.B. that "she needs to tell the truth. And she responded with 'It is too late for that now.' After that, she run ran [*sic*] away from the house, and [D.S.] didn't have a chance to talk to her after that." Id. at 20–21.

Although D.S. believed that, when he had the conversation with M.B., M.B. was not telling the truth, when asked if she told him that, D.S. said no. Id. at 20. When asked if he was aware if M.B. told anyone that she had made up an allegation, D.S. responded no. Id. at 13. D.S. also explained that he told several adults what M.B. had expressed to him, including his grandmother, his mother, his aunt, and his uncle, and that his mother's side of the family did not believe him. Id. at 13–14, 21.

D.S. testified that, although he knew the allegations against [Petitioner], he was not present at [Petitioner's] trial, did not read the trial transcript about what occurred, and had no knowledge about the actual testimony and facts that came out at trial. Id. at 5, 23–24, 32. D.S. stated that he first learned of the allegations through his maternal grandparents, but he could not "recall specifics" about what they said

and, when asked if he could state "anything else about [his] knowledge of the allegations against [his] father," D.S. said no. Id. at 30, 32. D.S. also stated that he had never discussed the case with anyone but [Petitioner's] PCRA attorney. Id. at 23–25.

D.S. said he had a normal family relationship with his sister prior to the allegations being made against [Petitioner], but that it ended about a year after the trial and he has not spoken with her since. Id. at 19, 23, 28. D.S. stated that he currently has a relationship with [Petitioner] and visits him in prison, that they wrote letters to each other, and that he misses his dad and hopes that he comes home. Id. at 27–28.

Commonwealth v. Sullivan, No. 356 WDA 2016, 2016 WL 6803882 (Pa. Super. Ct. Nov. 17, 2016) (unpublished memorandum at *3–4).

Trial counsel Robert Stewart was also called to testify. He stated that

[while] he did not have a specific recollection of speaking with D.S., [] he "believe[d he] did interview" D.S., that "as a practice, that is something [he] would have done," and that he did talk to him about what he would testify to, but not about whether he was going to testify. See N.T., 9/3/2015, at 37, 39–41, 46–47, 56–57, 59–60.

[Attorney Stewart offered the following reasons for not calling D.S. at trial:] …he was concerned that putting a 10- or 11-year-old child on the stand can alienate the jury and that he was concerned about how D.S. would respond to the prosecutor's cross-examination, given that the prosecutor had significant experience in dealing with child witnesses. Id. at 37–38, 40, 52, 55. Moreover, [he] explained that, when police read [Petitioner] the affidavit of probable cause with respect to the charges, [Petitioner] responded, "That's not all true," and [Attorney Stewart] was concerned that the prosecutor would ask D.S. what parts were true in his opinion. Id. at 38. [Attorney Stewart] also testified to how the jury might view [Petitioner] in light of calling his own son to testify against his sister, as it "could be interpreted by some as a desperate" and "non-caring parental act." Id. at 52–53. Further, counsel testified that he discussed D.S.'s testifying with [Petitioner] and that [Petitioner] never expressed any dissatisfaction with the decisions he and [Petitioner] were making, particularly with regard to strategy.

Commonwealth v. Sullivan, No. 356 WDA 2016, 2016 WL 6803882 (Pa. Super. Ct. Nov. 17, 2016) (unpublished memorandum at *5). At the conclusion of the hearing, the PCRA court denied relief. A written order to that effect was issued on September 30, 2015.

Petitioner filed an appeal to the Superior Court which was quashed as untimely. Thereafter, Petitioner sought, and was granted, reinstatement of his appellate rights. A timely appeal followed, challenging the PCRA court's determination that trial counsel's failure to call D.S. as a witness was objectively reasonable. The Superior Court affirmed the PCRA court's decision on November 17, 2016. On November 23, 2016, Petitioner, through Attorney McCulloch, filed a petition for writ of *habeas corpus* with this Court (ECF No. 1). On December 21, 2016, the undersigned entered an order (ECF No. 8) granting Petitioner's motion to stay and abate the federal court proceedings to allow petitioner to exhaust his state court remedies (ECF No. 7). On May 15, 2017, the Pennsylvania Supreme Court denied Petitioner's petition for allowance of appeal. Commonwealth v. Sullivan, 169 A.3d 522 (Pa. 2017). Thereafter, by order dated July 6, 2017 (ECF No. 12), this Court granted petitioner's motion to lift the stay (ECF No. 10).

Petitioner filed an amended petition for writ of *habeas corpus* on July 6, 2017, with brief in support thereof (ECF No. 14). On October 23, 3017, Respondents filed their answer. (ECF No. 22). Petitioner's reply was filed on November 15, 2017 (ECF No. 23).

### B. Petitioner's Claims

Petitioner's amended petition raises the following claims:

A. The petition should be granted because the state court's denial of relief on Petitioner's claim that trial counsel was ineffective is contrary to, and involved an unreasonable application of Strickland v. Washington, [446 U.S. 668 (1984)].

B. The evidence at trial was legally insufficient to support the convictions where the [Commonwealth] presented no physical evidence to support the sexual abuse allegations, presented no photographic evidence of the alleged crime scene, and where the alleged victim's testimony was contradictory and vague.

(ECF No. 14 at 18, 24).

### C. General Standards Governing Federal *Habeas Corpus* Review

1. <u>Exhaustion Requirement</u>

> Pursuant to 28 U.S.C. § 2254(b)(1)(A), the federal courts may grant a state prisoner's habeas petition only if the petitioner "has exhausted the remedies available in the courts of the State." AEDPA's exhaustion requirement mandates that the claim "must have been 'fairly presented' to the state courts." <u>Bronshtein v. Horn</u>, 404 F.3d 700, 725 (3d Cir. 2005) (quoting <u>Picard v. Connor</u>, 404 U.S. 270, 275, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971)). Fair presentation "means that a petitioner must present a federal claim's factual and legal substance to the state courts in a manner that puts them on notice that a federal claim is being asserted." Id. at 725 (internal quotation marks & citations omitted). In other words, the petitioner must afford the state system "the opportunity to resolve the federal constitutional issues before he goes to the federal court for habeas relief." <u>Zicarelli v. Gray</u>, 543 F.2d 466, 472 (3d Cir.1976) (*en banc*) (internal quotation marks & citations omitted). Fair presentation by the petitioner to the state courts is sufficient; the claims "need not have been considered or discussed by those courts." <u>Swanger v. Zimmerman</u>, 750 F.2d 291, 295 (3d Cir.1984) (citations omitted).

<u>Rainey v. Varner</u>, 603 F.3d 189, 198 (3d Cir. 2010).

In this regard, a petitioner must invoke "one complete round" of the applicable State's appellate review process, thereby giving the courts of that State "one full opportunity" to resolve any issues relevant to such claims. <u>O'Sullivan v. Boerckel</u>, 526 U.S. 838, 845 (1999) (holding that a petitioner must present every claim raised in the federal petition to the state's trial court, intermediate appellate court and highest court before exhaustion would be considered satisfied). Even if a state court refuses to consider the claim on procedural grounds, it is still exhausted as long as the state court had the opportunity to address it. <u>Bond v. Fulcomer</u>, 864 F.2d 306, 309 (3d Cir.1989). The petitioner has the burden of establishing that exhaustion has been satisfied. <u>Ross v. Petsock</u>, 868 F.2d 639, 643 (3d Cir. 1989); <u>O'Halloran v. Ryan</u>, 835 F.2d 506, 508 (3d Cir. 1987).

2. <u>Procedural Default Doctrine</u>

The mere fact that a petitioner can satisfy the statutory exhaustion requirement on the ground that further state procedures are unavailable does not necessarily mean that a federal court

can reach the merits of his or her claims. Claims deemed to have been exhausted because of a state procedural bar are procedurally defaulted, precluding a federal court from proceeding to address them further. See Lines v. Larkins, 208 F.3d 153, 160 (3d Cir. 2000). In Cone v. Bell, 556 U.S. 449, 129 S.Ct. 1769 (2009), the United States Supreme Court explained:

> It is well established that federal courts will not review questions of federal law presented in a *habeas* petition when the state court's decision rests upon a state-law ground that is independent of the federal question and adequate to support the judgment. In the context of federal *habeas* proceedings, the independent and adequate state ground doctrine is designed to ensure that the States' interest in correcting their own mistakes is respected in all federal *habeas* cases. When a petitioner fails to properly raise his federal claims in state court, he deprives the State of an opportunity to address those claims in the first instance and frustrates the State's ability to honor his constitutional rights. Therefore, consistent with the longstanding requirement that *habeas* petitioners must exhaust available state remedies before seeking relief in federal court, we have held that when a petitioner fails to raise his federal claims in compliance with relevant state procedural rules, the state court's refusal to adjudicate the claim ordinarily qualifies as an independent and adequate state ground for denying federal review.

Cone, 129 S.Ct. at 1780 (internal quotations and citations omitted).

    3.    Standard of Review for Exhausted, Non-Defaulted Claims

A petitioner is only entitled to federal *habeas corpus* relief if he meets the requirements of 28 U.S.C. § 2254(d), which provides:

> An application for a writ of *habeas corpus* on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). Section 2254(d) "firmly establishes the state court decision as the starting point in *habeas* review." Hartey v. Vaughn, 186 F.3d 367, 371 (3d Cir. 1999). This provision governs not only pure issues of law, but mixed questions of law and fact such as whether counsel rendered ineffective assistance. Werts v. Vaughn, 228 F.3d 178, 204 (3d Cir. 2000).

The Supreme Court has held that, "[u]nder the 'contrary to' clause, a federal *habeas* court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 412-13 (2000). The Court has also held that:

> the "unreasonable application" prong of § 2254(d)(1) permits a federal *habeas* court to "grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts" of petitioner's case. In other words, a federal court may grant relief when a state court has misapplied a "governing legal principle" to "a set of facts different from those of the case in which the principle was announced." In order for a federal court to find a state court's application of our precedent "unreasonable," the state court's decision must have been more than incorrect or erroneous. The state court's application must have been "objectively unreasonable."

Wiggins v. Smith, 539 U.S. 510, 520 (2003) (quoting Lockyer v. Andrade, 538 U.S. 63, 76 (2003) (other citations omitted)). In other words, "the question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold." Schriro v. Landrigan, 550 U.S. 465, 473 (2007) (citations omitted).

Section 2254(e) provides that:

> In a proceeding instituted by an application for a writ of *habeas corpus* by a person in custody pursuant to the judgment of a State court, a determination of a factual issue shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

28 U.S.C. § 2254(e)(1).

**D. Discussion**

Petitioner's first claim alleges ineffective assistance of his trial counsel.[1]  The United States

Supreme Court:

> established the legal principles that govern claims of ineffective assistance of
> counsel in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674
> (1984). An ineffective assistance claim has two components: A petitioner must
> show that counsel's performance was deficient, and that the deficiency prejudiced
> the defense. Id., at 687, 104 S.Ct. 2052. To establish deficient performance, a
> petitioner must demonstrate that counsel's representation "fell below an objective
> standard of reasonableness." Id., at 688, 104 S.Ct. 2052. We have declined to
> articulate specific guidelines for appropriate attorney conduct and instead have
> emphasized that "[t]he proper measure of attorney performance remains simply
> reasonableness under prevailing professional norms." Ibid.

Wiggins, 539 U.S. at 521.

To satisfy the second prong of counsel ineffectiveness, "a defendant must show that there

is a reasonable probability that, but for counsel's unprofessional errors, the result of the

proceedings would have been different. A reasonable probability is a probability sufficient to

undermine confidence in the outcome." Id. at 534 (quoting Strickland, 466 U.S. at 694.) In

addition, although a petitioner must satisfy both prongs to succeed on his ineffectiveness claim,

the Court noted that "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack

of sufficient prejudice, which we expect will often be so, that course should be followed."

Strickland, 466 U.S. at 697.

In evaluating claims of ineffective assistance of counsel, the question is not whether the

defense was free from errors of judgment, but whether defense counsel exercised the customary

---

[1] This claim was raised properly in his first PCRA petition; was addressed on its merits by the
PCRA court; and was heard and addressed in a timely appeal to the Pennsylvania Superior Court.
Thus, this claim is exhausted, not procedurally defaulted, and may be reviewed by this Court.

skill and knowledge that normally prevailed at the time and place. <u>Strickland</u>, 466 U.S. at 689. The

Supreme Court has "declined to articulate specific guidelines for appropriate attorney conduct and

instead ha[s] emphasized that '[t]he proper measure of attorney performance remains simply

reasonableness under prevailing professional norms.'" <u>Wiggins</u>, 539 U.S. at 521 (quoting

<u>Strickland</u>, 466 U.S. at 688).

Petitioner argues that counsel was ineffective for failing to call D.S. as a witness at trial.

(ECF No. 14, ¶¶ 44-59). Thus,

> [t]he pivotal question is whether the state court's application of
> the <u>Strickland</u> standard was unreasonable. This is different from asking whether
> defense counsel's performance fell below <u>Strickland</u>'s standard. Were that the
> inquiry, the analysis would be no different than if, for example, this Court were
> adjudicating a <u>Strickland</u> claim on direct review of a criminal conviction in a
> United States district court. Under AEDPA, though, it is a necessary premise that
> the two questions are different. For purposes of § 2254(d)(1),
> an *unreasonable* application of federal law is different from
> an *incorrect* application of federal law. A state court must be granted a deference
> and latitude that are not in operation when the case involves review under
> the <u>Strickland</u> standard itself.
>
> A state court's determination that a claim lacks merit precludes federal
> *habeas* relief so long as fairminded jurists could disagree on the correctness of the
> state court's decision. And as this Court has explained, evaluating whether a rule
> application was unreasonable requires considering the rule's specificity. The more
> general the rule, the more leeway courts have in reaching outcomes in case-by-case
> determinations. [I]t is not an unreasonable application of clearly established Federal
> law for a state court to decline to apply a specific legal rule that has not been
> squarely established by this Court.

<u>Harrington v. Richter</u>, 562 U.S. 86, 101 (2011) (emphasis in original; citations and quotation marks

omitted).

In concluding that Attorney Stewart's representation of Petitioner was not ineffective, the

PCRA court explained as follows.

> At the evidentiary hearing, [D.S.] testified that the pool table was small and
> the area underneath [where M.B. alleged the assaults occurred] it was packed

tightly with storage boxes that were difficult to pull out, such that no one would have been able to crawl beneath the pool table (Evidentiary Hearing Transcript, p. 8). He claimed to have knowledge of the specific allegations against [Petitioner], but could not recall any conversation when he was told of them. (E.H.T., p. 30-32). He testified that on two occasions, [M.B.] told him that she wanted things to go back to the way they were and that he responded by asking [M.B.] why she lied, though she never admitted to lying (E.H.T., p. 20). He also testified that he and [M.B.] were together at all times and there was never a time when he wasn't with her (E.H.T., p. 13).

[Petitioner] also presented the testimony of Robert Stewart, Esquire, his trial attorney. Mr. Stewart testified that it was his practice to speak to all family members and he did speak with [D.S.], though he did not have an independent recollection of the conversation (E.H.T., p. 56). He testified that he did not want to put [D.S.] on the stand because he believed child witnesses could be unpredictable. He was particularly worried because [Petitioner] had initially made a statement to the police that the allegations were "not all true", and thus he felt [D.S.] would be vulnerable to cross-examination on which of the allegations were true (E.H.T., p. 38). Mr. Stewart was familiar with the prosecutor, Jen DiGiovanni, Esquire, and believed her to be a good prosecutor who was particularly skilled with child witnesses and it was his opinion that she may have been able to elicit unexpected information from [D.S.] on cross-examination (E.H.T., p. 52). Moreover, attorney Stewart was concerned in general about how a jury would react to a father subjecting his young son to testimony in general and also in having him testify against his sister (E.H.T., p. 53). Finally, attorney Stewart testified that he discussed all matters of strategy and witnesses with [Petitioner], including whether to have [D.S.] testify, and [Petitioner] agreed with the strategy at the time (E.H.T., p. 39, 54-55, 57).

ECF No. 22, pg. 33-35 (quoting PCRA Court Opinion, at 4-7). The PCRA court also noted that, in addition to calling Petitioner to testify on his own behalf at trial, Attorney Stewart had mounted a vigorous defense in support of his theory that M.B. had made up the sexual assault allegations in retaliation for learning that Petitioner was not her biological father. The court explained as follows.

At trial, [Petitioner] argued that [M.B.] was lying and no inappropriate conduct ever occurred. In support of his defense, he presented the testimony of Christopher Sullivan, Mary May, Jeff Becker and Rose Karapandi who all testified that they witnessed no inappropriate conduct between [Petitioner] and [M.B.]. He also presented the testimony of [M.B.'s] grandmother, Kathy Sullivan, who blatantly called [M.B.] a liar [on direct examination]:

Q. (Mr. Stewart): During this time frame, did you ever have any disciplinary problems with [M.B.]?

15

> A. (Kathy Sullivan): Yes.
>
> Q. Like what?
>
> A. [M.B.] exaggerated stories. She lied a lot. She lied numerous times. She would lie from the time that if I would state something to her upstairs that she might get in trouble for, she would change the story by the time she got down and talked to her dad and said, Grandma is mad at me. And he would say, What did you do? And he was getting angry at me for disciplining her, telling her, until I would go and tell him the whole story.

Id. at 33-34 (quoting Trial Transcript Vol. I, p. 388-389).

In evaluating Petitioner's claim on its merits, the PCRA court concluded that

> there was an issue of credibility. For instance, [D.S.'s] description of the pool table, which [the court] remember[s] photographs of, was not accurate and it was shown that there was space under the pool table.  He said that he was never, ever separated from his sister, which would mean to me that they went to bed at the same time, they got up at the same time, they had their nightmares at the same time, they bathed and went to the bathroom at the same time, and this certainly sheds some question mark on his credibility.
>
> He did testify that [M.B.] said she wished things would go back to where they were and that she lied. But there is no testimony about what she lied about. And [the court] would imagine that a child in this situation would like things to go back. There are several viable interpretations. One could be just that they would go back to the way it was before [Petitioner] was molesting her.
>
> [The court has] known [Attorney] Stewart for many years and find that he has enjoyed an excellent reputation. He did present a reasonable basis for not calling the son in this case and he gave good reasons… He said that because of the age of the child, he did not want to alienate the jury. He was not sure how consistent the child's testimony would be. He would be concerned about [the prosecutor's] often aggressive cross-examination of defense witnesses and he talked about concerns.
>
> He also may or may not have said that [the court] would be angry if he called a witness to the stand. [The court] would suggest that this is not true; in fact, half of the people that testify in [this] courtroom are children, and [the court is] not angry when anyone calls them to the stand.
>
> …[T]here were people who testified, including the Petitioner's aunt and uncle, a grandmother, a great aunt, another aunt and the Petitioner's mother, and it is my

recollection from the trial that the grandmother came out and called the victim in this case a liar, she said she has always been a liar, she will always be a liar. So therefore, the issue is whether [D.S.'s] testimony would have been cumulative. [The court] believe[s] that it would have.

ECF No. 22, pg. 33-35 (quoting Evidentiary Hearing Transcript, at 74-76).

The Superior Court found that the record supported the PCRA court's determination that Attorney Stewart had a reasonable basis for not calling D.S. to testify, noting that the PCRA court found credible Attorney Stewart's testimony. The Superior Court further held that Petitioner failed to establish the requisite prejudice where "[a] review of the court's rationale as it relates to D.S.'s credibility reveals that it determined that 'the nature and quality' of his testimony was not 'such that there is a reasonable probability that the jury would have credited it and rendered a more favorable verdict.'" Commonwealth v. Sullivan, No. 356 WDA 2016, 2016 WL 6803882 (Pa. Super. Ct. Nov. 17, 2016) (unpublished memorandum at *7).

At this juncture, this Court must ask whether the Superior Court's decision was "contrary to the Strickland standard, involved an unreasonable application of Strickland, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented." Henderson v. DiGuglielmo, 138 F. App'x 463, 468 (3d Cir. 2005) (quotation marks omitted). Here, the Superior Court applied the standard set forth in Commonwealth v. Natividad, 938 A.2d 310, 321 (Pa. 2007). The Third Circuit and the Pennsylvania Supreme Court "have held that the ineffective assistance standard set forth by the Pennsylvania courts is materially identical to that articulated in Strickland." Henderson, 138 F. App'x at 469 (citations omitted). Thus, because Superior Court applied the correct standard, its opinion is not "contrary to" federal law.

Further, the Superior Court's decision does not involve an unreasonable application of clearly-established federal law. "This prong requires us to inquire 'whether the Pennsylvania

courts' application of <u>Strickland</u> to [petitioner's] ineffectiveness claim was objectively unreasonable, *i.e.*, the state court decision, evaluated objectively and on the merits, resulted in an outcome that cannot reasonable be justified under <u>Strickland</u>*."* <u>Id</u>. (citations omitted).  As the Third Circuit has noted, "[c]ounsel's failure to call a witness 'is precisely the sort of strategic trial decision that <u>Strickland</u> protects from second-guessing.'" <u>Id</u>. (quoting <u>Sanders v. Trickey</u>, 875 F.2d 205, 212 (8th Cir. 1989)).

Here, counsel testified that he did not call D.S. to testify at trial for a variety of reasons, including his desire to present Petitioner's viable defense (that M.B. had fabricated the allegations of assault) without upsetting the jury by pitting siblings against one another, and his concern that D.S. would not fare well under cross-examination by an experienced prosecutor.  These decisions constitute trial strategy, and are accorded deference under a <u>Strickland</u> analysis.  <u>Henderson</u>, 138 Fed. App'x at 470 (citations omitted).  Both the PCRA court and the Pennsylvania Superior Court credited counsel's explanation and found D.S.'s testimony to be flawed, noting the impossibility of D.S.'s contention that he was with M.B. "all" of the time and pointing out that his interpretation of M.B.'s alleged lies was purely speculative.

Further, under <u>Strickland</u>*,* prejudice "requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." <u>Strickland</u>*,* 466 U.S. at 687. To satisfy this test, it must be shown that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." <u>Id</u>. at 694. As noted above, Attorney Stewart called during his case-in-chief a number of witnesses to discredit M.B.'s testimony.  Because D.S.'s testimony was, essentially, cumulative of testimony presented by other defense witnesses, Petitioner has not met his burden of proving that there is a

reasonable probability that the outcome of trial would have been different but for counsel's alleged error. Thus, because this Court finds the state courts' analysis of trial counsel's decision to be a reasonable application of <u>Strickland</u>, no relief is due.

In his second *habeas* claim, Petitioner asserts that the evidence was "legally insufficient" to support his conviction. (ECF No. 14, pg. 24). Specifically, Petitioner challenges the Commonwealth's failure to present at trial corroborating physical evidence of M.B.'s sexual assault and/or "photographic evidence of the alleged crime scene," and asserts that M.B.'s testimony was "vague" and "contradictory." (<u>Id</u>.)

These claims were not raised before the state courts in Petitioner's counseled post-sentence motions or in his direct appeal. Rather, as previously noted, Petitioner's direct appeal raised three issues, including a claim that the verdict was against the weight of the evidence. However, it is well-settled under Pennsylvania law that such a claim is separate and distinct from a sufficiency-of-the-evidence claim. <u>See</u> <u>Commonwealth v. Widmer</u>, 744 A.2d 745, 751 (Pa. 2000). As previously discussed, "[a] petitioner satisfies the exhaustion requirement by demonstrating that the habeas claims were "fairly presented" to the state's highest court, either on direct appeal or in a post-conviction proceeding, in a procedural manner permitting the court to consider the claims on their merits." <u>See</u> <u>Bell v. Cone</u>, 543 U.S. 447, 451 n.3 125 S.Ct 847 (2005). Nonetheless, "[a] petitioner's failure to exhaust state remedies will be excused if state procedural rules preclude him from seeking further relief in state courts." <u>Lines</u>, 208 F.3d 153, 160. However, "Federal courts may not consider the merits of procedurally defaulted claims unless the petitioner demonstrates either cause for the procedural default and actual prejudice resulting therefrom, or that a fundamental miscarriage of justice will result if the court does not review the claims." <u>Merritt v. Pierce</u>, 239 F. Supp. 3d 801, 807 (2017) (citing <u>McCandless v. Vaughn</u>, 172 F.3d 255, 260 (3d

Cir. 1999)).  Petitioner has failed to discuss, much less demonstrate, cause that would lead this Court to consider his sufficiency claims on the merits.  Accordingly, Petitioner's second claim is denied as procedurally barred.

### E.  <u>Certificate of Appealability</u>

Section 2253 generally governs appeals from district court orders regarding *habeas* petitions.  Section 2253(c)(1)(A) provides that an appeal may not be taken from a final order in a *habeas* proceeding in which the detention arises out of process issued by a state court unless a certificate of appealability has been issued.  A certificate of appealability should be issued only when a petitioner has made a substantial showing of a denial of a constitutional right.  28 U.S.C. § 2254(c)(2).  Here, the record fails to show a violation of Petitioner's constitutional rights.  Accordingly, a certificate of appealability should be denied.

### F.  <u>Conclusion</u>

Based on the discussion above, Petitioner's Petition for Writ of *Habeas Corpus* (ECF No. 1) is denied.  Further, a certificate of appealability is denied.

<br>

/s Robert C. Mitchell
Robert C. Mitchell
United States Magistrate Judge

March 13, 2018

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

DAVID STEPHEN SULLIVAN,    )
)  Civil Action No. 16-1775
          Petitioner,    )
)
v.    )
)  Magistrate Judge Robert C. Mitchell
JAMEY LUTHER, Superintendent and    )
the ATTORNEY GENERAL FOR THE    )
STATE OF PENNSYLVANIA,    )
)
          Respondents.    )

## <u>ORDER</u>

AND NOW, this 13th day of March, 2018 for the reasons set forth above, the petition of David Stephen Sullivan (ECF No. 1) is DISMISSED, and because reasonable jurists could not conclude that a basis for appeal exists, a certificate of appealability is DENIED.

<u>/s Robert C. Mitchell</u>
Robert C. Mitchell
United States Magistrate Judge